# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Dependency of<br><br>J.Y. and N.Y.,<br><br><div align="right">Minor children.</div> | No. 60008-1-II<br>(consolidated with<br>No. 60018-8-II)<br><br>PUBLISHED OPINION |

GLASGOW, J.—JY and NY were living in their mother's home in Washington when the Department of Children, Youth, and Families (Department) filed a dependency petition. The trial court placed the children in foster care after it found that removal from the mother's home was necessary to protect the children from an imminent risk of physical harm. At the time of the petition and initial shelter care hearing, the Department had not yet located the children's father, MY, who was living in New Mexico with his wife and three other children.

MY learned of the dependency petition through relatives and reached out to the Department. He requested an initial shelter care hearing and argued that the Department could not meet its burden under the newly amended standard in RCW 13.34.065(5)(a)-(b), which was adopted to guard against erroneous family separations and to reduce bias in dependency proceedings and became effective in 2023. LAWS OF 2021, ch. 211, § 2(2), 9, 12.[1] The court expressed confusion about the new standard and said repeatedly that the Department had not

---

[1] The statute was amended again after these proceedings; we cite the current statute because those changes are not material to the issues in this appeal. *Compare* RCW 13.34.065(5) (effective June 6, 2024) *to* former RCW 13.34.065 (2021) (effective July 1, 2023 to June 5, 2024).

presented evidence to support a shelter care finding as to MY. Then, after two hearings, the court issued a written order refusing to apply the shelter care standard to MY and requiring continued shelter care based on its earlier findings as to the children's mother.

MY sought discretionary review. While his motion for discretionary review was pending, the dependency petition was dismissed and the children began living with MY. A commissioner of this court determined that the issues were moot but granted review to clarify the amended shelter care standard under the public interest exception to mootness. No party moved to modify the commissioner's order.

As a threshold matter, the Department asks us to refuse to reach the merits because the issues are moot. We decline this invitation to revisit our commissioner's ruling. We also decline MY's invitation to create a standard for showing gender bias in dependency proceedings.

Turning to the merits, MY argues that the court erred by refusing to apply the shelter care standard to him and then ordering continued shelter care of the children despite lacking any basis specific to him under RCW 13.34.065(5)(a). The Department concedes the trial court erred by failing to require the Department to make reasonable efforts to engage MY in services as a prerequisite to ongoing shelter care under RCW 13.34.065(5)(a)(i). The Department also concedes the record did not support a finding that the children had "no parent . . . to provide supervision and care" under RCW 13.34.065(5)(a)(ii)(A). And the Department agrees that the record did not support shelter care under RCW 13.34.065(5)(a)(ii)(B)(I)-(III), which set forth three findings that all must be made before removing a child based on abuse or neglect.

We agree with the parties that the trial court erred by failing to hold a shelter care hearing where it applied the standards in RCW 13.34.065(5)(a)-(b) to MY. Absent the needed findings

under RCW 13.34.065(5)(a)-(b) as applied to MY, the trial court did not have authority to order continued out-of-home care and was required to release the children to MY. We vacate the shelter care order, but remand is not needed given that the children now reside with MY and the dependency was dismissed.

FACTS

I. INITIAL SHELTER CARE ORDER

JY and NY were living in their mother's home in Washington and had not seen their father, MY, in several years. Meanwhile, MY was living in New Mexico with his wife and three other children. The mother's home was dangerous and the Department unsuccessfully tried to engage the mother in services. The mother did not know MY's location, and the Department did not immediately engage its parent locator service to find MY.

The Department filed a dependency petition in October, 2023, when JY was 11 and NY was 6 years old. The Department argued that the mother posed a risk of imminent physical harm to the children, but the petition contained no allegations about MY's recent conduct except that the Department did not know his whereabouts. At a contested shelter care hearing as to the mother, the Department explained that it tried to locate MY by asking the mother, searching on social media, and searching court records, but it did not use its parent locator service. The trial court found that the children were at risk of imminent harm due to the mother's abuse or neglect. The court also found that the Department made diligent efforts to locate MY. The trial court placed the children in foster care.

## II. Continued Shelter Care After MY's Appearance

About a month after the children were placed in foster care, MY learned about the case through other channels and reached out to the Department. He was appointed counsel and requested a shelter care hearing, arguing the children must be released to his care. The trial court and the Department acknowledged that MY was entitled to a shelter care hearing within 72 hours under RCW 13.34.065(1)(b). The court said it was granting MY's request for a shelter care hearing under that provision.

A.      First Hearing Regarding MY

MY argued that the children must be returned to his care because the Department entirely failed to present any evidence to satisfy the statutory criteria in the recently amended version of RCW 13.34.065(5)(a) *as to MY*. Specifically, the Department made no reasonable efforts to engage MY in services, a prerequisite for shelter care under RCW 13.34.065(5)(a)(i). And even had it made reasonable efforts as to MY, the Department never presented evidence or even alleged that MY was a danger to the children under RCW 13.34.065(5)(a)(ii)(B)(I). MY attached documents showing he was engaged in drug court, had been clean for nearly a year, and that he was already preparing living, health care, and school arrangements for the children.

The Department told the trial court that it was "not moving forward on shelter care with regards to [MY]." Verbatim Rep. of Proc. (VRP) at 222. The Department explained that it had not observed problems during visitation with MY and that "it would be speculative at best to argue that he's not a fit parent." VRP at 223. And the Department acknowledged that it could not argue for continued shelter care because it had no evidence to support a finding that the children had "no parent . . . to provide supervision and care" under RCW 13.34.065(5)(a)(ii)(A) or that MY posed

4

a risk of "imminent physical harm due to child abuse or neglect" under RCW 13.34.065(5)(a)(ii)(B)(I).

JY, through counsel, argued that residing with MY would be dangerous because JY was struggling with thoughts of suicide and JY was afraid of MY. The Department said it had no evidence about the children's mental health and could not argue for continued shelter care on that ground.

The trial court asked if it needed to make a finding about shelter care with regard to MY even though he had no contact with the children for several years prior to the petition. MY argued that this issue was plainly settled in his favor by the Washington Supreme Court in *In re Dependency of L.C.S.*, 200 Wn.2d 91, 514 P.3d 644 (2022). The Department said it was "not disagreeing" with MY's interpretation of *L.C.S.*, and added that the plain language of the statute granted MY the right to a shelter care hearing under RCW 13.34.065(1)(b) because he was not able to participate in the one that was already held. VRP at 226.

The trial court then explained that to date, there had been "no evidence presented" that would support a shelter care finding as to MY and said, "I don't think I could find shelter care as to the father." VRP at 234. The trial court also made an express finding that the Department had not shown MY posed an imminent risk of physical harm to the children. But the court also said that releasing the children to MY did not "seem to be consistent with their interest" because the court did not know if MY was a fit parent. VRP at 235. The court therefore continued the hearing and requested briefing on whether it was required to release the children to MY because it could not find a basis for shelter care as to MY under RCW 13.34.065(5)(a).

B.    Second Hearing Regarding MY

At a second hearing a week later, MY again argued it was dispositive that the Department failed to meet its shelter care burden under RCW 13.34.065(5)(a) as to him. The mother's attorney conceded he could not find authority counter to MY's position.

The foster parent filed a declaration showing that JY had increased anxiety, depression, and suicidal ideation due to his fear, confusion, and uncertainty about the possibility of increased contact with MY. JY's attorney expressed deep concern about JY's suicidal ideation and argued that this qualified as "imminent" risk of physical harm under RCW 13.34.065(5)(a)(ii)(B)(I). The Department argued that the children had "no parent . . . to provide supervision and care" under RCW 13.34.065(5)(a)(ii)(A) because the children were not attached to MY, and moving them would cause them emotional harm. The Department asked for continued foster placement and time to provide reunification services to MY.

In its oral ruling, the trial court initially said that the removal standard under RCW 13.34.065(5)(a) did not apply because the children did not reside with MY prior to the dependency so "there wasn't a removal" from MY's home. VRP at 252. Yet the court acknowledged that "there really were no services offered" to MY and that there was "nothing alleged in the [p]etition regarding abuse or neglect on the part of the father." VRP at 252, 254. The trial court also said it could not find that the children had "no parent . . . to provide supervision and care" under RCW 13.34.065(5)(a)(ii)(A) because there was no evidence showing that MY would not be able to care for the children. VRP at 253. The trial court expressed that it was "struggling . . . with [RCW 13.34.065](5)" and needed more time to review case law, including *L.C.S.* VRP at 253.

C.    Written Findings and Conclusions[2]

In its written findings and conclusions issued two days later, the trial court concluded, "Because shelter care has been established prior to the father appearing, the court does not need to conduct a new shelter care because the father's arrival does not result in a new removal of the children from their home." Clerk's Papers (CP) at 129. Though it had previously acknowledged MY's right to a shelter care hearing under RCW 13.34.065(1)(b), the court wrote that "[t]he statute does not explicitly address the need for a shelter care hearing once the second parent appears." CP at 125. The trial court did not address RCW 13.34.065(3)(b), the threshold for a parent's waiver of their right to a shelter care hearing.

Instead of applying the shelter care standard as to MY, the court treated MY as a "placement resource," "maintain[ed] shelter care" and "den[ied] the motion for placement with [MY]." CP at 129-30. The trial court wrote that "[t]he absence of allegations against [MY] in the petition does not mean that the court can simply conclude he is a fit parent and place the boys out of the state." *Id.* The trial court therefore concluded that MY "must demonstrate fitness if he wants placement" because placement with an unfit parent would not be in the children's best interests. CP at 130.

Nevertheless, the trial court also wrote that it would "review the specific requirements of shelter care as it applies to the father." CP at 126. First, it concluded that reasonable efforts were not required as to MY under RCW 13.34.065(5)(a)(i), which provides that the court may not order shelter care unless the court finds there is reasonable cause to believe that "reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to

---

[2] The court did not enter an order using the required forms as mandated by RCW 13.34.035.

make it possible for the child to return home." The court reasoned that "the child's home" in this case was the mother's home, reasonable efforts were provided to the mother before the "removal," and releasing the children to MY would not be a "return home" within the meaning of the statute. RCW 13.34.065(5)(a)(i). Although it did not think the requirement applied to MY, the court specifically found that the Department had not shown it provided MY with any services and the record would not support a finding of reasonable efforts toward MY.

The trial court next discussed RCW 13.34.065(5)(a)(ii)(A), which authorizes shelter care if the court finds that a child has "no parent . . . to provide supervision and care." The order suggested that MY was required to affirmatively prove his fitness to show that he was a parent capable of providing supervision and care for the children. Specifically, the court wrote, "[MY] now appears and claims that he is fit and no one has presented evidence that he is not." CP at 127. The court also wrote, "While [MY] may be fit, the court does not know that because he has been absent and he lives in the State of New Mexico." *Id.* The order did not clearly conclude that MY was not capable of providing supervision and care to his children, and this factor was not a clear basis for the court's order of continued shelter care. Instead, it appears the court was not certain whether MY was fit, but the court imposed on MY the burden of showing his fitness.

Next, the trial court applied RCW 13.34.065(5)(a)(ii)(B)(I)-(III), which set forth three findings that all must be made before ordering shelter care based on abuse or neglect. Under element (I), the court rested on its earlier finding that the mother posed an imminent risk of physical harm to the children, but made findings about MY with respect to what it called the "request of placement with the father." CP at 128. The court found that placing the children with MY would create a risk of imminent physical harm to JY, but it did not find that this would support shelter

care because the statute requires a causal connection between the conditions inside the parent's home and the imminent risk of harm to the child. The order specifically stated, "[T]he court cannot find that the risk of imminent physical harm is due to child abuse or neglect on the part of the father." *Id.*

Applying element (II), the trial court again rested on its finding that it was contrary to the children's welfare to return to their mother's home. But the trial court also wrote, "To the extent the language 'returned home' means to be placed in [MY]'s home, the court believes that on balance that until the court has information that [MY] is a fit parent, it is contrary to the welfare of the children to be placed with their father." CP at 128-29.

Applying element (III), which requires weighing the harm of removal against the risk of harm posed by a parent, the court stated, "There has been no evidence that not being placed with their father now will harm the boys. Instead[,] the particular circumstances of these boys **today** require that they remain in the proximity of their home, and their mother." CP at 129.

MY then sought discretionary review of the court's written findings and conclusions under RAP 2.3(b)(2). Notice of Discr. Rev.(Jan. 12, 2024); Mot. for Discr. Rev. (Apr. 10, 2024) at 31.

D.    Reunification

While MY's motion for discretionary review was pending before this court, the trial court entered three more shelter care orders maintaining the children's placement in foster care, but increasing MY's visitation time with the children. MY's visits with the children went well, and both children told the visitation supervisor that they wanted to live with MY. Although the children were "struggling" in foster care and JY was having behavior problems at school, the visitation supervisor observed no behavior problems during visitation with MY. VRP at 283.

The Department then moved to place the children with MY and said that if the court granted that motion, it would move to dismiss the dependency. But JY's counsel argued that living with MY would be dangerous because of JY's mental health struggles. The trial court reserved ruling on the placement change motion for one month so MY and the children could have overnight visits before placement.

At the next hearing, the court authorized the return of both children to MY. It deferred ruling on the Department's motion to dismiss and explained to the parties that it planned to dismiss the case after one month "[s]o long as there [we]re no major issues" in the interim. VRP at 331. The dependency was dismissed in May 2024.

### III. ORDER GRANTING DISCRETIONARY REVIEW

A commissioner of this court then granted discretionary review under RAP 2.3(b)(2), though the appeal became moot after the children were placed with MY. Ruling Granting Discr. Rev., *In re Welfare of J.Y.*, No. 60008-1-II, consolidated with No. 60018-8-II at 1, 10 (Wash. Ct. App. June 3, 2024). The commissioner concluded that the court's error in refusing to apply RCW 13.34.065 to a noncustodial parent would not warrant review "because our Supreme Court has already decided this issue in M.Y.'s favor in *Matter of Dependency of L.C.S.*, 200 Wn.2d 91, 514 P.3d 644 (2022), and no further guidance on noncustodial parent rights is necessary." *Id.* at 10-11. But the commissioner granted review because the juvenile court

> also kept J.Y. and N.Y. out of M.Y.'s care because despite the Department's repeated assertions that it could not show M.Y. was unfit, and despite that the court concluded the Department did not make reasonable efforts to place the children with M.Y., and despite that it concluded that placing the children with M.Y. would not place them at imminent risk of physical harm due to abuse or neglect, the juvenile court determined that M.Y. could not meet the children's needs.

*Id.* at 11. According to our commissioner, that aspect of the court's ruling underscores the need for "authoritative guidance on the operation of the new shelter care standards" in the recently amended RCW 13.34.065(5). *Id.*

The commissioner set the case for review by a panel. *Id.* at 12. The commissioner's ruling provided, "This grant of review does not limit any arguments that M.Y., the Department, or J.Y. choose to bring up in merits briefing." *Id.* No party moved to modify the commissioner's ruling.

ANALYSIS

I. SCOPE OF REVIEW

As a preliminary matter, the Department asks that we dismiss this appeal as moot. We decline to revisit this argument because it was resolved in the order granting discretionary review. Additionally, MY asks us to adopt a standard for evaluating possible gender bias in dependency proceedings and to reverse the order on that basis. We decline to exercise our discretion to reach that issue.

A.      Mootness

The Department argues that we should dismiss the appeal as moot because we cannot offer relief because the children have already been placed with MY and the dependency has been dismissed. We may still review a moot case if it involves an issue of continuing and substantial public interest. Our commissioner concluded that the issues in this case were moot because the children were already placed with MY. Ruling Granting Discr. Rev. at 10. But the commissioner granted review because the case involved another issue that was of continuing and substantial public interest—specifically, the need for "authoritative guidance on the operation of the new shelter care standards" after a recent amendment to RCW 13.34.065(5). *Id.* at 11; *see also L.C.S.,*

11

200 Wn.2d at 99 (We may still review a moot case if it involves an issue of continuing and substantial public interest.).

Neither party sought modification of the commissioner's ruling, so it became the final decision of this court. *See Hough v. Ballard*, 108 Wn. App. 272, 277 n.3, 31 P.3d 6 (2001) ("If an aggrieved party fails to seek modification of a commissioner's ruling within the time permitted by RAP 17.7, the ruling becomes a final decision of the court."). Thus, we decline to consider the Department's mootness argument because the commissioner has already decided that the case involves an issue of continuing and substantial public interest.

B.      Gender Bias

MY argues that we should adopt an "objective observer" standard for determining whether there has been gender bias against a party in dependency proceedings and that under that test, the court's order should be reversed. Although this argument is not barred by the order granting review, which did not restrict the arguments the parties could raise to the panel, we decline to consider it because it was not raised below and we have discretion under the mootness doctrine to determine which issues warrant discussion under the mootness exception. Ruling Granting Discr. Rev. at 12.

It is certainly troubling that the trial court treated a father as a "placement resource" rather than as a parent entitled to the same shelter care procedures afforded the children's mother. CP at 129. And we are mindful of MY's concerns about systemic problems, unconscious biases, and the potentially discriminatory conduct of judicial and nonjudicial actors in child welfare situations. But the record does not make it clear that gender bias played a role in the challenged ruling, and the parties did not have an opportunity to develop a record on this issue because it was not raised

below. Nor did the trial court have the opportunity to address this issue. Moreover, there were plenty of non-gender-related concerns at play here—the court and the Department expressed concerns about sending the children to live in another state, in unknown conditions, and after JY expressed fear and extreme distress about the idea of moving.

Given that the issue of gender bias was not raised below, the record is not developed on this issue, and the issues here are moot, we elect not to reach this issue.

## II. SHELTER CARE STANDARD

Our legislature has declared that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020. And the Washington Supreme Court has explained that "the preservation of families is a paramount interest shared by the parents, the child, and ultimately, the Department." *In re Welfare of D.E.*, 196 Wn.2d 92, 103, 469 P.3d 1163 (2020). Although the Department sometimes must "intervene to protect the child," Washington courts also recognize that "[r]emoval carries long-term risk of serious emotional and psychological harm to the child." *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); *L.C.S.*, 200 Wn.2d at 106.

In recognition of the harms of family separation, the legislature recently amended several child welfare provisions in order to guard against erroneous family separations and to reduce bias in dependency proceedings. LAWS OF 2021, ch. 211, § 2(2), 9, 12. The new law, known as the Keeping Families Together Act, presumes that children must be placed with their parents while a dependency proceeding is pending. *See* RCW 13.34.065(5)(a). That presumption can be rebutted if the Department makes the requisite showing satisfying specific statutory requirements at a shelter care hearing. RCW 13.34.065(5)(a)-(b).

MY argues that the trial court erred by failing to apply the newly amended shelter care standard to MY because he was a noncustodial parent. The Department concedes that the shelter care standard applies to both custodial and noncustodial parents. We agree with the parties. We also take this opportunity to provide additional guidance to trial courts in applying the newly amended shelter care standard.

In interpreting a statute, our goal is to ascertain and implement the legislature's intent, beginning with the plain meaning of the statute. *In re Pers. Restraint of Ansell*, 1 Wn.3d 882, 900, 533 P.3d 875 (2023) (plurality opinion). "Plain meaning is discerned from both the text of the statute, the statutory scheme as a whole, and related statutes." *Id.* "[W]e do not add words where the legislature has chosen not to include them." *Langhorst v. Dep't of Lab. & Indus.*, 25 Wn. App. 2d 1, 9-10, 522 P.3d 60 (2022). If the statute's meaning is clear from its plain language, we give effect to its meaning as an expression of legislative intent. *Ansell*, 1 Wn.3d at 900. If the statute is ambiguous, we then resort to tools of statutory construction. *Id.* The interpretation of a statute is an issue that we review de novo. *Id.*

A.    MY Was Entitled to a Timely Shelter Care Hearing

We agree with the parties and hold that the trial court erred when it concluded that MY was not entitled to a timely shelter care hearing where the court would apply the standards in RCW 13.34.065(5)(a)-(b).

"Shelter care" means "temporary physical care" of a child outside of their home while a dependency is pending. RCW 13.34.030(25), .065(1)(a).[3] It is an "initial step" that is sometimes

---

[3] Recent amendments to RCW 13.34.030 do not affect our analysis, so we cite the current version of the statute.

necessary to protect the child from harm until the court holds a fact-finding hearing where it determines if the child is dependent. *In re Dependency of Baby Boy B.*, 3 Wn.3d 569, 573, 554 P.3d 1196 (2024); RCW 13.34.070(1), .110(1). After the fact-finding hearing, the court must enter a dependency order or dismiss the petition. RCW 13.34.110(1). If dependency is established, the Department may later petition to terminate the parent-child relationship. RCW 13.34.132, .180.

"A shelter care order is an extraordinary measure and is intended to be an interim solution in place for a short time." *Baby Boy B.*, 3 Wn.3d at 576-77. A shelter care order necessarily means that a child will be separated from their parents. *Id.* at 577. Given the severe and lasting harm of removal, the shelter care statute requires continuous judicial oversight in the form of periodic shelter care review hearings. *Id.* at 577-78. Specifically, the court must hold an initial shelter care hearing within 72 hours of the child's removal and every 30 days thereafter to evaluate continued out-of-home placement. *Id.*; RCW 13.34.060(1), .065(1)(a).

A parent's right to a shelter care hearing cannot be waived unless they appear at a hearing and "the court determines that the waiver is knowing and voluntary." RCW 13.34.065(3)(b). As such, the statute requires the Department to make "diligent efforts" to locate and serve a child's parents upon the child's removal. RCW 13.34.050(3). If a shelter care hearing was held but a parent "for good cause [wa]s unable to attend," then the court must schedule the hearing within 72 hours of the parent's request. RCW 13.34.065(1)(b). After holding a shelter care hearing, the court "*shall release* a child . . . to . . . *the child's parent*" unless the required conditions are met. RCW 13.34.065(5)(a) (emphasis added).

None of the shelter care provisions we cite above differentiates between a custodial and noncustodial parent. It is true that the statute uses the terms "removal" and "return home." RCW

13.34.065(5)(a)(i). But *L.C.S.* illustrates that the terms "removal" and "return home" do not limit the shelter care requirement to only custodial parents. 200 Wn.2d at 102-04. There, the Washington Supreme Court was asked to interpret RCW 13.34.065(5)(a)(i), which requires the Department to show that "reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home." RCW 13.34.065(5)(a)(i); *see also L.C.S.*, 200 Wn.2d. at 102. The Supreme Court read the provision to require "efforts toward placement with *both parents*," even when one parent had sole custody prior to removal. *Id.* at 104 (emphasis added). Thus, the *L.C.S.* court did not read the terms "removal" and "return home" to suggest the shelter care standard applies only to custodial parents.

Nor should we interpret the references to "removal" and "return home" to impliedly limit statutory shelter care protections to custodial parents. As a matter of due process, parents are entitled to an opportunity to be heard before any shelter care order is issued, including an order for continued shelter care when the children reside outside the parent's home under a prior shelter care order. *Baby Boy B.*, 3 Wn.3d at 574-76. This is because parents have a fundamental liberty interest in the care, custody, and management of their children that "'does not evaporate'" simply because the child resides outside of the parent's home. *D.E.*, 196 Wn.2d at 102 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion)). To excuse the Department of meeting its burden toward a noncustodial parent merely because the Department has not yet located the parent by the time of removal would be an extraordinary restriction of the rights of noncustodial parents that would contradict *L.C.S.* and invade a parent's due process right to participate in shelter care proceedings.

Here, MY did not waive his right to a shelter care hearing—he demanded one, as was his right under RCW 13.34.065(1)(b). The trial court should have proceeded within 72 hours with a shelter care hearing focusing on whether the children had to be separated from MY. *Id.* Instead, after two hearings where MY argued repeatedly that the statute mandated the children's release to his care and supervision, the court concluded, "Because shelter care has been established prior to the father appearing, the court does not need to conduct a new shelter care because the father's arrival does not result in a new removal of the children from their home." CP at 129.

The trial court erred by depriving MY of a timely shelter care hearing because the Department had not yet located him at the time of removal. This ruling was contrary to RCW 13.34.065(3)(b), which protects parents from unknowingly waiving their right to a shelter care hearing, and RCW 13.34.065(1)(b), which requires a new shelter care hearing when a parent missed the first shelter care hearing for good cause. The trial court's refusal to apply the statutory shelter care standards to MY is also troubling in light of the substantive and procedural due process protections for parents that the Supreme Court has emphasized in child welfare proceedings. *See Baby Boy B.*, 3 Wn.3d at 574-76.

We hold that the trial court should have promptly afforded MY a timely shelter care hearing when he demanded one, and the court should have applied the standards in RCW 13.34.065(5)(a)-(b).

B.      Applying the Shelter Care Standard

MY argues that the trial court further erred by concluding the Department was not required to make reasonable efforts to prevent removal as to MY; placing a burden on him to prove his

fitness under RCW 13.34.065(5)(a)(ii)(A); failing to perform the required analysis under RCW 13.34.065(5)(a)(ii)(B)(I)-(III); failing to address the required considerations under RCW 13.34.065(5)(b)(i)-(ii); and ultimately ordering shelter care without a legal basis. We agree that the trial court should have applied the standards set forth in RCW 13.34.065(5)(a)-(b), at least until the failure to meet one of the statutory requirements for shelter care became dispositive.

"The primary purpose of the shelter care hearing is to determine whether the child can be immediately and safely returned home while the adjudication of the dependency is pending." RCW 13.34.065(1)(a). As we note above, the legislature amended the shelter care standard effective in 2023. LAWS OF 2021, ch. 211, § 9, 12. The recent changes were intended "to safely reduce the number of children in foster care and reduce racial bias in the system *by applying a standard criteria* for determining whether to remove a child from a parent when necessary to prevent imminent physical harm to the child due to child abuse or neglect." *Id.* § 2 (2) (emphasis added). By design, the new standard requires the Department and the trial court to find certain specific elements before removal of a child from their parent's care in every case, thereby limiting the impact of racial bias on removal decisions.

The statute presumes that a child can be placed safely in their parent's home while a dependency is being adjudicated—it provides that "[t]he court *shall* release a child alleged to be dependent to the care, custody, and control of the child's parent, guardian, or legal custodian *unless* the court finds there is reasonable cause to believe" that certain elements are met. RCW 13.34.065(5)(a) (emphasis added). The burden is on the Department to prove that shelter care is necessary and if it fails to do so, the court must release the child to their parent. *Id.* The statute

contains no statement or implication that a parent must prove their own fitness before the child can reside with them.

Turning to the specific shelter care elements themselves, the Department must first show that it made "reasonable efforts" to all parents to prevent the need for removal or allow the child to return home. RCW 13.34.065(5)(a)(i); *see also L.C.S.,* 200 Wn.2d at 104. If it has not, the inquiry ends and continued shelter care is not authorized. But if the Department *has* made reasonable efforts, it must next show that shelter care is authorized under one of the three alternative bases found in RCW 13.34.065(5)(a)(ii)(A)-(C).

First, RCW 13.34.065(5)(a)(ii)(A) authorizes a shelter care order if "[t]he child has no parent, guardian, or legal custodian to provide supervision and care for such child." Second, RCW 13.34.065(5)(a)(ii)(B) authorizes a shelter care order under a newly adopted two-phase test to justify removing a child based on abuse or neglect. Third, RCW 13.34.065(5)(a)(ii)(C) authorizes a shelter care order if the parent, guardian, or custodian to whom the child could otherwise be released has been charged with custodial interference.

1.      The trial court erred by concluding that the reasonable efforts requirement did not apply to MY because the children did not reside with him prior to removal

MY argues that the trial court erred when it concluded that RCW 13.34.065(5)(a)(i)'s "reasonable efforts" requirement did not apply to MY because the children did not reside with MY prior to removal. Our commissioner also concluded this was error that was well established after the Washington Supreme Court's decision in *L.C.S.* Under RCW 13.34.065(5)(a)(i), trial courts may not order shelter care unless the Department shows that "reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home." The Washington Supreme Court held in *L.C.S.* that the

19

Department must make reasonable efforts as to both parents, regardless of where the children resided prior to removal. 200 Wn.2d at 104. Here, although the parties alerted the trial court to *L.C.S.*, the trial court made the same error the trial court in *L.C.S.* made. The trial court incorrectly concluded that the reasonable efforts requirement did not apply to MY because the children did not reside with him prior to removal.

2.     <u>The trial court erred by placing the burden on MY to show his fitness under RCW 13.34.065(5)(a)(ii)(A)</u>

The parties argue that the court erroneously placed a burden on MY to prove his fitness to show that he was a parent capable of "provid[ing] supervision and care" under RCW 13.34.065(5)(a)(ii)(A). We agree that it was legal error to place a burden on MY to prove his fitness when analyzing this basis for shelter care.

RCW 13.34.065(5)(a)(ii)(A) authorizes a shelter care order if the Department shows "reasonable cause to believe that . . . [t]he child has no parent, guardian, or legal custodian to provide supervision and care for such child." The Department's failure to meet its burden means the child must be released, but it does not mean that the dependency petition will be dismissed. RCW 13.34.065(5)(a). Dependency proceedings may continue, and the Department may still prove that the child is dependent at the subsequent fact-finding hearing or eventually proceed to file a termination petition if it believes the parent is unfit. RCW 13.34.110(1), .132, .180.

At each stage of a dependency proceeding, the Department must meet a different burden of proof—at shelter care, that burden is quite low, but it is still the Department's burden. And the Washington Supreme Court recently explained that great care is warranted at the shelter care stage because the shelter care statute requires "only a minimal evidentiary showing," yet it has great ramifications for children and families. *Baby Boy B.*, 3 Wn.3d at 577. Moreover,

20

the evidence is largely controlled by the State, the ultimate decision is based on the subjective determination of one person (the judge), . . . the State can shape the history and future of the child through placement and visitation, and the State has access to experts and social workers who are also employed by the State. All of these factors are exacerbated by the fact that the majority of cases involve persons who are poor, uneducated, and/or minorities, leaving an opening for class and racial bias.

*D.E.*, 196 Wn.2d at 104 (citation omitted). This imbalance makes it all the more important that courts hold the Department to its burden of proof to effectuate the goals of "reuniting the family as soon as safely possible, holding parties accountable, ensuring that the case proceeds to either dismissal or dependency, and ensuring the 'health, welfare, and safety of the child.'" *Baby Boy B.*, 3 Wn.2d at 577 (quoting RCW 13.34.065(4)).

Furthermore, "unfitness" is a term of art that means a parent cannot meet their child's basic needs. *In re Parental Rights of K.M.M.*, 186 Wn.2d 466, 493, 379 P.3d 75 (2016). In dependency and termination proceedings, parental unfitness is distinct from the mere existence of parental deficiencies that might form a basis for a dependency. *Id.*; *In re Dependency of Schermer*, 161 Wn.2d 927, 943, 169 P.3d 452 (2007); *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). Indeed, the dependency stage "'is a period during which parents have an opportunity to correct parental deficiencies.'" *In re Welfare of C.S.*, 168 Wn.2d 51, 53, 225 P.3d 953 (2010) (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 28, 765 P.2d 307 (1988)). Then, in the termination stage, courts determine whether a parent is unfit after a full trial involving a broad inquiry of "whether the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety." *K.M.M.*, 186 Wn.2d at 493.

Here, the court's discussion of RCW 13.34.065(5)(a)(ii)(A) shows that it erred by placing a burden on MY to show his fitness before his children could be returned to him at the shelter care

stage. Doing so was clear legal error even though the record does not clearly show that the court relied on RCW 13.34.065(5)(a)(ii)(A) to order continued shelter care.[4] As we note above, the Department must be held to its burden to show that shelter care is needed in order to safeguard the vital interests implicated by shelter care orders.

When the Department seeks out-of-home placement based on a finding that a child has "no parent . . . to provide supervision and care" under RCW 13.34.065(5)(a)(ii)(A), the Department must present proof in support of that finding. It is legal error to shift the burden onto the parent to prove they can provide supervision and care for their child. Where, as here, the Department has no evidence to show that a parent cannot provide adequate supervision and care, RCW 13.34.065(5)(a)(ii)(A) does not provide a legal basis for shelter care.

Moreover, the trial court should not have repeatedly delayed a shelter care decision with regard to MY. As the Washington Supreme Court has explained with regard to the parental termination stage, "[i]t is not equitable or just for the Department to be granted a continuance that enables it to obtain more evidence in order to meet its burden of proof when it already controls the narrative and services to be provided." *D.E.*, 196 Wn.2d at 107. Although we acknowledge the Department might have a much shorter period of time to provide services and, if necessary, gather evidence to support shelter care, the Supreme Court's concerns are also relevant at this stage. In

---

[4] Although the parties both assert that the court made this finding, our review of the record suggests otherwise. The court said specifically that it could not find that the children had "no parent . . . to provide supervision and care" under RCW 13.34.065(5)(a)(ii)(A) because there was no evidence showing that MY would not be able to care for the children. Then, the court wrote that its order would set forth bolded statutory language followed by a "discussion" of each factor. CP at 126. Following this form, the court set forth the statutory language in bold and in its discussion, it did not clearly find that RCW 13.34.065(5)(a)(ii)(A) was a basis for continued shelter care, instead relying on its earlier findings under RCW 13.34.065(5)(a)(ii)(B). Nowhere in the written order did the court state that MY was not a parent who could provide supervision and care to the children.

the absence of any evidence to support a finding that MY could not provide adequate supervision and care to his children, the court's inquiry should have ended there rather than presuming he was unfit and keeping the children out of his care while the Department continued to gather evidence to meet its burden.

On this record, the Department concedes it did not meet its burden to show that MY was unable to provide supervision and care under RCW 13.34.065(5)(a)(ii)(A). We agree with the parties that RCW 13.34.065(5)(a)(ii)(A) did not provide a basis for continued shelter care, and that the court erred by placing the burden on MY to prove parental fitness or that he could provide adequate supervision and care to his children.

3. <u>The trial court erred by refusing to apply the standard in RCW 13.34.065(5)(a)(ii)(B) to MY because he was a noncustodial parent</u>

The parties also agree that RCW 13.34.065(5)(a)(ii)(B) did not authorize continued shelter care. We agree and hold that the court erred in its interpretation of the three required elements of the first phase of applying RCW 13.34.065(5)(a)(ii)(B)(I)-(III) and then further erred by failing to engage in the second phase, found in RCW 13.34.065(5)(b), altogether.

Although RCW 13.34.065(5)(a)(ii)(A) did not provide a basis for shelter care, a court can still order shelter care if reasonable efforts have been made with regard to the parent in question and the requirements in RCW 13.34.065(5)(a)(ii)(B) are met. Until 2023, RCW 13.34.065(5)(a)(ii)(B) authorized shelter care if the court found that "[t]he release of such child would present a serious threat of substantial harm to such child." Former RCW 13.34.065(5)(a)(ii)(B) (2021). But our legislature replaced that language with a heightened removal standard intended to remedy Washington's pattern of racially disproportionate child removals by requiring specific conditions be met. LAWS OF 2021, ch. 211, § 2(2).

One sponsor of the Keeping Families Together Act testified that a heightened removal standard was needed to avoid unwarranted removals that could instead be remedied by providing services and support while the children remained at home. Racial Disproportionality in Child Welfare, Work Sess. Before the H. Child., Youth & Fams. Comm., 67th Leg., Reg. Sess. (Wash. Jan. 20, 2021), at 1 hr., 10 min*., video recording by* TVW, Washington State's Public Affairs Network.[5] Testimony focused on the harm of child removal and its disproportionate effect on families and communities of color. *Id.* at 1 hr., 14 min. to 1 hr., 17 min. Testimony also emphasized the need for a structured analysis so that judicial decision making would be more consistent and less prone to bias. *Id.* at 1 hr., 16 min.

To that end, the new alternative basis in the amended statute requires two phases. In the first phase, the Department must satisfy three elements. For the first element, the Department must show that removal is "necessary to prevent imminent physical harm due to child abuse or neglect." RCW 13.34.065(5)(a)(ii)(B)(I). The legislature specified that this requires showing a "causal relationship between the particular conditions in the home and imminent physical harm to the child." *Id.* As the bill's sponsor testified, this addresses the longstanding pattern of poverty-related removals justified with vague notions of "substantial harm" under former RCW 13.34.065(5)(a)(ii)(B). Racial Disproportionality in Child Welfare, Work Sess., *supra*, at 1 hr., 10 min. For the second element, the court must find that it would be "contrary to the welfare of the child to be returned home." RCW 13.34.065(5)(a)(ii)(B)(II).

---

[5] https://tvw.org/video/house-children-youth-families-committee-2021011327/?eventID=2021011327

Further, in the third element of the first phase of the analysis, the Department must show that "any imminent physical harm to the child outweighs the harm the child will experience as a result of removal." RCW 13.34.065(5)(a)(ii)(B)(III). Crucially, this element requires courts to look not only at the conditions inside the home but at the well documented trauma of family separation and the risk that the child will suffer acute, preventable trauma in the foster care environment. *See* Emma VanderWeyst, Comment, *Creating and Maintaining Consistent Standards Regarding the Role of Parental Substance Abuse at Shelter Care Hearings in Washington State*, 98 WASH. L. REV. 763, 778-81 (2023); Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families*, 102 MARQ. L. REV. 1161, 1165-71 (2019). By mandating a balancing test, our legislature has recognized that the Department should be held to its burden to specify why shelter care will be less harmful than releasing the child to their parent in the circumstances of each specific case.

Even after the three elements are satisfied, the second phase requires courts to consider measures that could mitigate the risks identified in the first phase. In the second phase, the Department should identify the available prevention services and "the court *shall* place the child with the parent" if services would eliminate the risk of returning the child home. RCW 13.34.065(5)(b)(i) (emphasis added). Courts also must consider temporary protective orders that could obviate the need for removal where, for example, the risk to the child comes from another member of the household rather than from the child's parents. RCW 13.34.065(b)(ii). These are not empty provisions—they provide meaningful protections to parents and children in recognition of the harm removal of the children from their parents can cause and the value of services that mitigate risk to the child.

Here, the court did not purport to apply either phase to MY. Instead, the order for continued shelter care rested on earlier findings about the first phase, RCW 13.34.065(5)(a)(ii)(B)(I)-(III) elements with regard to the children's mother and did not discuss the second phase, RCW 13.34.065(5)(b)(i)-(ii) with regard to either parent. Before ordering shelter care, the trial court should have considered all three RCW 13.34.065(5)(a)(ii)(B)(I)-(III) requirements and then the two RCW 13.34.065(5)(b)(i)-(ii) considerations with regard to MY. As we note above, the plain language of the shelter care statute does not differentiate between custodial and noncustodial parents. Though the elements in RCW 13.34.065(5)(a)(ii)(B)(I)-(III) mention "removal" and "return home," this does not foreclose applying the standard to noncustodial parents like MY. *See L.C.S.*, 200 Wn.2d at 102-04. And given the strong constitutional protections afforded to parents, regardless of custody arrangements, it would be unjust and constitutionally questionable to lower the Department's burden to establish shelter care based on whether a parent had custody of a child immediately preceding removal.

On this record, the Department concedes it did not have evidence to support a finding that the children would face a risk of imminent harm tied to the conditions in MY's home, so the record would not support a finding under RCW 13.34.065(5)(a)(ii)(B)(I). Because the Department could not meet its burden to show causality, as required under this element, RCW 13.34.065(5)(a)(ii)(B) did not authorize continued shelter care. Moreover, to the extent the trial court relied on RCW 13.34.065(5)(a)(ii)(B) for its ultimate shelter care order, it erred in ordering shelter care without considering the second phase considerations in RCW 13.34.065(5)(b)(i)-(ii).

No. 60008-1-II

CONCLUSION

In sum, we hold that the trial court erred by failing to provide MY with a timely shelter care hearing, excusing the Department from providing reasonable efforts as to MY, erroneously placing a burden on him to prove his fitness under RCW 13.34.065(5)(a)(ii)(A), failing to perform the required analysis under RCW 13.34.065(5)(a)(ii)(B)(I)-(III), failing to consider the subsequent considerations under RCW 13.34.065(5)(b)(i)-(ii), and ultimately by ordering shelter care without a legal basis. Accordingly, we vacate the challenged shelter care order. Remand is not needed because the children were placed with MY and the dependency was dismissed.

GLASGOW, J.

We concur:

MAXA, P.J.

PRICE, J.

27